J

# SIMONETTI & ASSOCIATES

ATTORNEYS AT LAW
144 WOODBURY ROAD
WOODBURY, NEW YORK 11797

TELEPHONE: (516) 348-7600
TELECOPIER: (516) 470-9014

LOUIS F. SIMONETTI, JR.
TIMOTHY J. FALLON

JOAN AGOSTINO *
PAUL J. EDELSTEIN
REGINA A. MATEJKA
ERIC P. MUELLER
ELLEN LARANOWSKI
FRANK A. RACANO
SANDRA M. SPECTOR
MARIA G. ALBERTSON

OF COUNSEL

MEMBER OF THE NEW YORK BAR
AND CONNECTICUT BAR *

October 1, 2015

**VIA FACSIMILE (212) 419-8457**
Darrell M. Joseph
Clerk of the Court
Supreme Court, State of New York
Appellate Division, Second Department
45 Monroe Place
Brooklyn, NY 11201

Re:    Denker Youngs v. Denker Youngs
       Supreme Court, Suffolk County – Index No.: 016968/2014
       Appellate Division Docket No.: 2015-08125

Dear Mr. Joseph:

I am counsel for the Plaintiff-Appellee in the captioned matter.

We received notice at 2:30 pm on even date, indicating that the Appellant intends on bringing an emergency application at 4:30 pm tomorrow afternoon by Order to Show Cause seeking his "intent to petition for a writ of certification of the entire case on emergency." Firstly, we are unavailable to appear at that time at the Appellate Division in Brooklyn on such short notice. However, secondly, and most importantly, we cannot determine what relief he is seeking from this Honorable Court. Furthermore, on September 15, 2015, this Honorable Court issued a letter on a prior motion filed by the Appellant indicating that since a bankruptcy proceeding is pending, the motion has been stayed and held in abeyance.

As such, in the event the Court is inclined to address the Appellant's application, it is respectfully requested that the matter be scheduled for another date.

Thank you for your consideration in this matter. Should there be any questions or concerns, please do not hesitate to contact me.

SIMONETTI & ASSOCIATES

Very truly yours,

Louis F. Simonetti, Jr.

LFS
Encl.

cc:    Brian Denker Youngs
       Via Email: Rabbibriand@moderndivinities.com

K

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF KINGS

------------------------------------------------------X

BRIAN H. DENKER-YOUNGS

                              Plaintiff,

                -against-

EDWARD J. DENKER-YOUNGS, aka
EDWARD JOHN DENKER-YOUNGS
a ka JOHN YOUNGS, aka E J YOUNGS ,
a ka JOHN J DENKER-YOUNGS, aka
EDWARD JOHN YOUNGS,
aka E JOHN YOUNGS

                              Defendant.

------------------------------------------------------X

INDEX NO.: 54013/15
DATE SUMMONS FILED: 8/31/2015

**SUMMONS**

*Plaintiff's designates KINGS
COUNTY as proper venue and
basis for Trial by Jury, as county of
residence and venue of Plaintiff's
Chapter 11 Bankruptcy estate that is
before Hon. Chief Judge Carla Craig.*

# ACTION FOR DIVORCE
# COMPLAINT FOR ANNULMENT

To the above named Defendant:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a

copy of your answer on the Plaintiff within twenty (20) days after the service of this summons,

exclusive of the day of service, where service is made by delivery upon you personally within the

State of New York, or within thirty (30) days after completion of service where service is made in any

other manner.  In case of your failure to appear or answer, judgment will be taken against you by

default for the relief demanded in the complaint.

Dated: August 24, 2015

                              BY: BRIAN H. DENKER-YOUNGS, *Pro Se*
                              25 BOERUM STREET APT 18E
Defendant's Address:          BROOKLYN, NY 11206
33 Pennington Drive           e: bhdenker@gmail.com
Huntington, NY 11743          m: 917-373-5019

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------X

BRIAN H. DENKER-YOUNGS

INDEX NO.:
DATE SUMMONS FILED:

Plaintiff,

-against-

EDWARD JOHN DENKER-YOUNGS
aka JOHN YOUNGS, aka E J YOUNGS, aka
EDWARD J YOUNGS, aka E JOHN YOUNGS,
aka JOHN J DENKER-YOUNGS,
aka EDWARD JOHN YOUNGS

**VERIFIED COMPLAINT**

Defendant.
------------------------------------------------------X

     **BRIAN H. DENKER-YOUNGS,** being duly sworn, deposes and says under the penalty of perjury that:

1. I am the Plaintiff in the above-entitled action as such, I am fully familiar with all of the facts and circumstances surrounding the instant matter and complaint seeking an annulment of marriage and finding sufficient cause herein that the party's marriage is voidable

2. At all times hereinafter mentioned, and at the time of the commencement of this action, the parties were and still are residents of the State of New York.

3. I currently reside at 25 Boerum Street, Apt. 18E in the County of Kings, State of New York and am debtor-in-possession having been forced to file a Voluntary Petition for Chapter 11 Bankruptcy with the United States Bankruptcy Court Eastern District of New York, Case: 15-41069 on March 13, 2015 currently before the Honorable Chief Justice Carla E. Craig as a direct result of the economic abuse and fraudulent acts of the defendant.

4. Defendant upon information and belief is currently residing at 33 Pennington Drive, Huntington, NY 11743 with an established known secondary residence and address of 316 West Neck Road, Huntington, NY 11743 and upon filing of an instant application through his counsel on August 6, 2015 accepted venue as the County of Kings, establishing himself as creditor to my bankruptcy estate.

5. As debtor-in-possession, presently residing in Kings County, New York and of limited financial resources, to which my entire estate is being administrated through US Trustee in the County of Kings, therefore hereby designates KINGS COUNTY as the proper venue and jurisdiction for trial.

6. Defendant and I met February 9, 2009 and became domiciled and or about August 10, 2010 having opened joint checking accounts with Bethpage Federal Credit Union and conjoined insurance policies and had a verbal arrangement and understanding as we began to create a joint home together therein and prior to amended NY Dom Rel. § 10-a, 10-b, 11, 13, no such legal or judiciary ruling of same-sex.

7. Defendant and I were parties however within days of New York State's legalization of same-sex marriages, to a public display and solmization of marriage on July 30, 2011 in Lake Ronkonkoma, New York, Suffolk County having performed the rites and religious rituals required thereof by Jewish tradition, both speaking words of public intention vowing by and in accordance with *"the Law of Moses and Israel."*

## AS AND FOR DEFENDANTS ACTS OF FRAUD AND MISREPRESENTATION DEEMING THE MARRIAGE VOIDABLE

8. Consent to marry and be an agreeable party to said marriage was obtained thru fraudulent and intentional misrepresentations and lies by the Defendant. Prior to said marriage, for the specific purpose of inducing me into marrying him, promising to me that he would be a good, loyal and dutiful husband.

3

9. As such and maintained throughout our relationship and reinforced even during a recent informal discussion with Defendants pastor Jack Crabtree to which is available reinforcing the points herein, I relied upon Defendant's representations and was induced thereby consenting to said marriage relying upon such promises and representations, however Defendant knew them to be false and untrue and yet still conveyed the same intending to deceive and defraud me as is exhibited in a telephone discussion via a recorded line on August 25, 2014, such that:

   i. Prior to the marriage, Defendant represented that he identified with and was of "Protestant" faith and agreed, promising to raise any children that we may parent together in the "Jewish" faith. Defendant even went forth having desired and took on the obligations of "Jewish mitzvoth" in the taking of a Jewish name. However, subsequent to the marriage and prior to the commencement of the within action, Defendant had lied and misrepresented his religion and in fact when confronted, Defendant outwardly admitted to such non-disclosure specific to he being of a "Born-Again Evangelical Christian" faith. Found hidden away within our home were handwritten documents both of the Defendant and his mother which contained anti-Semitic undertones and anti-gay/homosexual rhetoric of hate and disdain. Financial statements and even the Defendants' taxes showcased that he had been and was secretly funding and supporting institutions like "Youth for Christ" and "Shelter Rock Church" who publically make condemnations about homosexuals, same-sex marriages and proclaim only messianic believing Jews as being "true Jewish people" with thousands of dollars each year.

   ii. Moreover, subsequent to the marriage, and discovery of Defendant's true religious faith and beliefs, the Defendant informed me that he would not agree

4

to raise any children we may have in the Jewish. Soon thereafter, I also began to become subjected to and exposed to constant and public ridicule and emotional abuse by Defendant's controlling and manipulative mother Matje G. Youngs, and her sister Niesje Lowne, who regularly and continually berated my religious beliefs as a non-messianic believing practicing Jew and as a homosexual male asserting that g-d detests homosexuals, and that I would be destined for nothing but a life of condemnation, challenges and illness unless I change my ways and embrace evangelical Christian teachings as they do.

iii.   Defendant also never disclosed the true and accurate state of his financial affairs to me but have discovered dating back to even 2006 before ever meeting him, even by way of emails and letters of his mother that he was in a bad financial way.

## AS AND FOR DEFENDENTS' ACTS OF ECONOMIC & WHITE COLLAR CRIMES AND FINANCIAL FRAUD

10. Subsequent to the parties' marriage, your Deponent has only recently learned also committed acts of economic fraud, engaged in a life-style to which he and his mother are engaged for years.

11. Such conduct that appears to have begun even prior to the marriage, Defendant began unnecessarily incurring and reassigning debts in my name, secretly began deferring sizable amounts of his salary upwards near Twenty-Thousand Dollars plus a year, re-directing, withholding, commingling and converting an approximated Two Hundred  Seventeen Thousand Dollars ($217,000) of marital funds/income earnings between 2012 and 2014 with his mother. Defendant had also been bank-rolling his mother's living expenses and debts out of

their shared Bank of America accounts, using the same utility companies and outside services where when question would claim they were our joint expenses.

12. Defendant it appears in 2003 committed his first act of mortgage fraud adding a secondary mortgagor to his 99 W Shore Road mortgage in the name of E J Youngs and Edward J Youngs who are both aliases he uses and are one and the same. Thereafter in 2006, submitted a universal loan application claiming the original value and price of his Three Hundred Thousand ($300,000) 2001 home purchase was $625,000 and secured a loan for nearly $305,000.

13. Unbeknownst to me until recent, Defendant was engaging in a conduct dissipating any joint credit or liquid funds and assets we had jointly to the tune of hundreds of thousands of dollars. Our household and marital finances, debt obligations and the day-to-day handling of mail and household related items had been handled from the time we became domiciled thru September 2014 by the Defendant whereby I routinely and consistently without cause to assume otherwise relied upon representations made by the Defendant as being complete, factual and truthful.

14. On closer review and self-auditing of all accounts I could still grant access to as the Defendant I discovered manipulated my access to access in having my access issued as being "custodial" to his . The Defendant would routinely and regularly circulate money between accounts, make and circulate cash / atm withdrawals and quite frequently wrote checks payable to both of us named all without my knowledge and simply wrote "For Deposit Only" affixing both his name and mine as endorsing amounts in the thousands.

15. Defendant also within a matter of months without my knowledge or consent dissipated a home equity line of credit needlessly and without my consent funding his and his mother's everyday living and several costly updates to 316 W Neck Road, Huntington, NY 11743 withdrawal sizable amounts as exampled:

6

- On October 10, 2013 in the amount of Seven Thousand Five Hundred Forty Dollars and Thirty Four cents ($7,540.34).

- On October 28, 2013 in the amount of Sixteen Thousand One Hundred and Eighteen Dollars ($16,118).

- On October 15, 2013 in the amount of Eleven Thousand Seven Hundred Dollars ($11,700).

- On November 17, 2013 in the amount of Sixteen Thousand One Hundred Seventeen Dollars and Seventy-Two Cents ($16,117.72).

- On December 5, 2013 in the amount of Ten Thousand Two Hundred Dollars ($10,200.).

- On January 13, 2014 in the amount of Ten Thousand Nine Hundred Twenty-Five Dollars ($10,925.00).

- On February 14, 2014 in the amount of Five Thousand Nine Hundred Eighteen Dollars ($5,918.00).

- On March 18, 2014 in the amount of Two Thousand Five Hundred Dollars ($2,500.00).

- A total estimated of Eighty-One Thousand Nineteen Dollars and Forty Cents ($81,019.41) in additional monies to his Chase Sapphire from our joint checking

- Over Sixteen Thousand ($16,000) in total from our Home Equity and Joint Chase Account to his and his mother's Citibank account

16. Defendant has stripped our home that we jointly purchased in October 2012, to which I withdrew almost $45,000 from my separate pre-marital 401(k) toward the down payment of

the house, and maxed out and utilized a One Hundred Twenty-Five Thousand Dollar Bethpage Federal Credit Union Home Equity Line of Credit (without my knowledge or consent), again without my knowledge, subsidized and never disclosed having done so, several costly home improvements and renovations to the house where his mother resides and to which he is co-trustee.

17. Defendant within only weeks of marrying, and while Defendant's father spent his final weeks hospitalized before having passed-away was secretly running around, applying and securing mortgage re-financing for nearly Three Hundred Thousand Dollars ($300,000), opened secret banking and money market accounts while Defendant's mother and I traveled daily from Suffolk County Long Island to the Upper West Side of Manhattan to visit the hospital all.

18. Defendant had been engaging in a course of conduct seeking out to intentionally ruin my credit worthiness engaging in acts including that of identity theft, transacting on my personal accounts without authorization, transferring debts, incurring unnecessary charges and late fees, intentionally missing payments or paying minimum balances while living off his credit cards and paying them routinely in full, rerouting and withholding mail, bills, and causing negative filings and unnecessary late fees posting to my credit file..

19. Defendant was also apparently engaging in a course of conduct setting up fake electronic payee accounts in online banking portals, secretly moderating and restricting my access rights to banking and financial accounts of ours, Evidence of the same and other acts have been documented via a formal complaint filed November 2014 against Defendant and Defendant's mother  seeking assistance" from Economic Crimes Bureau Chief Maureen McCormick with the Suffolk County District Attorney's Office who would only engage due to us being married with a court requesting their intervention and examination for fraud and such violations under DRL 155, 190 and other relevant New York State Family Offenses.

20. Defendant's conduct throughout has proven to be nothing but fraudulent, misrepresentations lies and theft, influenced and conspiring with his mother Matje G. Youngs acting at times jointly and individually to intentionally cause and bring about financial harm and debt without my knowledge, consent or authorization.

21. Evidenced of the same on May 6, 2015, Detective Kenneth Giallanza of the 90th Police Precinct, Brooklyn, New York traveled to Suffolk County, NY and arrested the Defendant and thereafter was arraigned in Kings County Criminal as the suspected offender of a New York Police Department Investigation into an unauthorized Citibank AHC that was traced by the banking institution to an account benefiting John Youngs.

22. Defendant took advantage of my declining health and several surgeries which began on / around December of 2011, requiring surgeries and hospitalizations including a Posterior Inter-body Lumbar Fusions (PILF) L4-S1 (Northshore-LIJ Huntington Hospital 1/7/2013), an Anterior Inter-body Lumbar Fusion (AILF) L4-S1 (Northshore-LIJ Manhasset 05/15/2013), Hernia repair along with abdominal wall reconstructive surgery and abdominal scar revision (Northshore-LIJ Manhasset 09/09/2013), three (3) stress fracture repairs to the lower left extremity (2011-2013), Gastrointestinal bleed – Northshore-LIJ Manhasset 12/25/2011), Gaul bladder removal (St. Francis Hospital 07/16/2014), and a stroke (Northshore-LIJ Huntington and Manhasset 09/26/2014).

23. Such other economic acts the Defendant committed included apparently very pre-meditated and almost daily maneuvering for example while tending to medical clearance to undergo my first spinal surgery, on January 2, 2013 the Defendant contacted my Discover credit card as me and transferred Four Thousand Dollars ($4000) of debt from Defendant's Chase Sapphire credit card. Whereas, just days earlier, transacting sizable payments to his credit cards in amounts of Eight Hundred Forty Dollars Thirty Five cents ($840.35) to a Citibank Credit Card

in the name E J Youngs, Twenty Seven Thousand Nine Hundred Seventy Nine Dollars ($27,979) to a Citibank Credit Card in the name E John Youngs and Six Thousand Six Hundred Twenty Dollars and Sixty-Four cents ($6,620.64) to a GM Mastercard account in the name E John Denker Youngs.

24. On several occasions including January 2013, March 2013 and September 2014, Defendant while making sizable payments to his credit cards, would intentionally cause a delay in making a deposit to our joint Chase Checking account, thus forcing our mortgage for the marital home located at 33 Pennington Drive to present with non-sufficient funds, forcing an overdraft of charges to my separate Chase credit account (often that had no balance) such that on January 2, 2013 an overdraft of One Thousand Two Hundred Dollars ($1200), on March 7, 2013 an overdraft for Six Hundred Fifty Dollars ($650) and on September 6, 2014 an overdraft for One Thousand Two Hundred Fifty Dollars ($1250).

25. Another such example on March 25, 2013 without authorization, Defendant endorsed a check by printing my name on the back of a check for Four Hundred Dollars ($400), depositing the check into our joint Chase Checking Account. Not aware of even having received the check as defendant withheld the same as he apparently was doing with healthcare insurance medical reimbursement checks, presented a check from Marc Gerber, Attorney at Law on October 12, 2012 payable to Brian Denker-Youngs for nearly five plus months. I only discovered this and other checks and transactions recently after requesting duplicate copies of every transaction on this checking account from the bank.

26. Defendant even withheld business mail and client payments such that on July 24, 2013 without consent or authorization of myself or a Board Member of Modern Divinities, Corp. took mail addressed to "Rabbi Brian Denker-Youngs" which contained a check in the amount of Four Hundred Dollars ($400), endorsing the check "For Deposit Only" affixing my name and

misappropriating funds intended for Modern Divinities Corp. by depositing such funds into our joint account.

## AS AND FOR DEFENDANT'S ACT OF INSURANCE AND SUSPECTED MORTGAGE FRAUD ON THE MARITAL HOME

27. On October 12, 2012, your deponent and the Defendant closed on some real property located at 33 Pennington, Drive Huntington, NY 11743 whereby a certified true copy of the JPMorgan Chase Bank Mortgage Document indicating "Borrower" for the property referenced both "Edward J. Denker-Youngs and Brian H. Denker-Youngs"

28. Defendant engaged with personal friend Ken Bell of K Bell & Associates issue and manage such insurance policies and declarations for the same real property located at 33 Pennington Drive, Huntington NY 11743 and referenced hereto as the marital home, co-owned by your deponent and defendant

29. Title insurance had been issued by First American Title Insurance Company of New York declaration dated October 12, 2012 illustrates both names of the insured homeowner(s) as Edward J. Denker-Youngs and Brian H. Denker-Youngs.

30. Despite Defendants' sudden and surprising representation that apparently I had to come off the mortgage or risk us getting a higher interest rate, Defendant beginning in April 2012 and continuing through October 2012, kept having two concurrent mortgage loan applications run with us jointly and individually, up until the very day of closing. I was a co-applicant on the current mortgage as late as September 20, 2012 as far as I have documentation for.

31. Defendant apparently was planning some form of fraud with respect to the home purchase and against me as without authorization he and his family's friend Ken Bell reissued property insurance declarations after closing removing me from such declarations.

32. On or about November 26, 2012, without my knowledge or consent he and Bell submitted a Nationwide Mutual Federal Flood Insurance application certifying "under punishment of fine or imprisonment under applicable federal law" the statements made therein are correct to the best of their knowledge. They listed one owner of the home, John Denker-Youngs and ironically enough our marital home I have been informed is not within a flood zone that would require flood insurance.

## AS AND FOR GROUNDS TO GRAND JUDGEMENT OF DIVORCE AGAINST THE DEFENDANT BY ANNULING THE PARTIES MARRIAGE ON GROUNDS OF FRAUD.

33. Such acts referenced herein and throughout are not acts that would be deemed that of a good, loyal and dutiful husband.

34. Aside from being economically and financially victimized and abused by the defendant, had any of the aforementioned, be it his true religion, he and his family's hatred and discriminatory disdain for homosexuals, and Jews or the truth about their criminal white collar lifestyle, I never would have agreed to become domiciled or marry the Defendant.

35. Since the discovery of all of these deceptions, lies and betrayal I have not cohabited with the Defendant.

36. No children have been born of this marriage and as a result of the Defendant's true character and beliefs as I never would consent or agree to raising children in any other faith but Judaism nor raising children with a dishonest individual.

37. The within action is being commenced within the required two (2) years of discovery of facts pursuant to CPLR§203(f) and the facts herein alleged as constituting grounds for finding the marriage of parties voidable due to Defendants intentional acts, lies and misrepresents.

38. I also respectfully am requesting that the Honorable Court find sufficient cause of such frauds to rise to the level of deeming this marriage voidable and issuing by way of an award of ancillary relief for Plaintiff, an annulment of marriage without prejudice to entitlements having had been a victim of frauds committed by both the Defendant and his mother.

39. Despite my challenging and declining health, many operations requiring weeks of recovery, I have always been a good, dutiful, and proper HUSBAND, unwavering in believing and wanting to be a devoted friend to the Defendant, and accepted member of his family.

40. I do not know and will never know why the Defendant chose to target me for his criminal acts, that he clearly chose to commit and engage in with his mother, Matje G. Youngs, a clear and willing co-conspirator and accomplice to such economic thefts and fraud.


**WHEREFORE,** I ask this honorable court find sufficient cause and thereafter entering an immediate judgment against the Defendant for the within action for divorce, by and between the parties such that:

a) Granting ancillary relief to the Plaintiff finding the marriage voidable and issuing a decree of absolute Annulment without prejudice to the division of assets and pension or retirement entitlements

b) Pursuant to NY DOM. LAW § 237, with defendant being the moneyed spouse and not bankrupt, granting an award for counsel fees in the sum of Thirty-Thousand Dollars ($30,000) with leave, payable directly on retainer with any balance in excess held in escrow toward anticipated and future litigation expenses to counsel of Plaintiff's choosing.

c)   Directing and appointing a Forensic Accounting of defendants' income, expenses, and banking, credit and investment and financial accounts opened or active from August 2010 through present.

d)   Awarding Plaintiff a greater equitable share of the marital property compensating the Plaintiff with a reasonable sum commensurate with the fiscal theft and impact resulting from Defendant's fraudulent conduct, marital waste and conversion of funds.

e)   Awarding Plaintiff sole ownership and title to the marital home and all of its' contents therein.

f)   Awarding Plaintiff his equitable share of Defendant's Pension inclusive of additional years' parties bought back and earned through Defendants secret deferments and increased contributions

g)   Awarding Plaintiff his equitable share of investment and wealth management, accounts and retirement trusts held by the Defendant

h)   Directing the Defendant to maintain a minimum life insurance policy in the amount of One Million Dollars ($1,000,000) naming Plaintiff as owner and sole beneficiary.

i)   Awarding Plaintiff his equitable share of all monies recorded on deposit August 26, 2015 in checking and savings accounts.

j)   Awarding Plaintiff exclusive use and enjoyment of the 2014 Mercedes GLK 350 along with assignment of all expenses related thereto

k)   Directing the Defendant to bring current any and all arears, repairs, violations, open permits, and expenses associated with the marital home.

l)  Directing the Defendant to return any and all items removed from the marital home for inventorying and equitable division as showcased in December 12, 2014 video of marital home capture with plaintiff's counsel and available to the court

m)  Directing the Defendant to maintain medical / health coverage for the Plaintiff on his State/Government Health Insurance plan for a period of no less than 36-calendared months avoiding any issues of coverage for pre-existing medical conditions and the immediate and significant increase in health coverage costs and minimal coverage on private plans.

n)  Granting the Plaintiff any and other further relief the court deems just and proper.

Dated: August ___, 2015

Respectfully submitted,

BRIAN H. DENKER-YOUNGS, *Pro Se*
25 Boerum Street, Apt 18E
Brooklyn, NY 11206

15



At an Individual Assignment Term of the Supreme Court of the State of New York held in and for the County of Suffolk at the Courthouse thereof located at 400 Carleton Avenue, Central Islip, New York on the 6 day of November, 2014.

PRESENT

Hon. **HON. DAVID T. REILLY**
_____
Justice

_____x

EDWARD JOHN DENKER-YOUNGS,

                              Plaintiff,

          -against-

BRIAN H. DENKER-YOUNGS,

                              Defendant.
_____x

MOTION/CROSS/OSC
FEE PAID
Judith A. Pascale
Suffolk County Clerk

Index No.: 14-016968

### ORDER TO SHOW CAUSE

Assigned Justice:
Hon. David T. Reilly

UPON reading and filing the annexed affidavit of Defendant, BRIAN H. DENKER-YOUNGS, duly sworn on the 5th day of November, 2014, the affirmation of NATASHA MEYERS, ESQ., dated the 5th day of November, 2014, and upon all the pleadings and proceedings heretofore had herein,

LET the plaintiff, EDWARD JOHN DENKER-YOUNGS, or his attorney show cause at an Individual Assignment Term thereof, to be held in and for the County of Suffolk, at the Courthouse located at 400 Carleton Avenue, Central Islip, New York, on the ___ day of November, 2014, at 9:30 o'clock in the forenoon of said day or as soon thereafter as counsel may be heard, why an Order should not be made and entered herein:

          (a)   . Awarding the Defendant exclusive use, occupancy and possession

of the marital residence, located at 33 Pennington Drive, Huntington, New York and its contents;

(b)    Directing the Plaintiff to pay his pro-rata share of the mortgage, homeowner's insurance, property taxes, heating oil, electric, landscaping, and repair and to immediately pay and bring current any and all arrears that may exist with respect to any of the foregoing charges and expenses, retroactive to the date of this application;

(c)    Awarding the Defendant exclusive use and enjoyment of the 2014 Mercedes GLK automobile that he operates and the 2012 Volkswagen Eos;

(d)    Directing the Plaintiff to pay the lease payments, insurance and repairs on the Mercedes automobile, retroactive to the date of this application;

(e)    Directing the Plaintiff to immediately provide an accounting of $125,000.00 used from the Home Equity Line of Credit from the date the line of credit was opened until the present time;

(f)    Directing the Plaintiff to immediately provide an accounting of as to what the Plaintiff did with his income from the date of marriage until the present time;

(g)    Directing the Plaintiff to immediately provide an accounting of the payments made on his Chase Sapphire Credit Card from the date of marriage until the present time;

(h)    Directing the Plaintiff to immediately provide an accounting of the medical insurance checks he received on the Defendant's behalf from the date of marriage until the present time;

(i)    Directing the Plaintiff to pay interim counsel fees on behalf of the Defendant in the sum of $10,000.00, without prejudice to future applications for

8. I had additional 9 ½ spine surgery in May 2013. In or around Ju[...] 2014, while I was receiving treatment at the St. Francis Emergency Room, the Plainti[...] became enraged and he violently grabbed my arm that had I.V. lines causing me t[...] suffer, physical pain, fear and embarrassment.

9. In August 2013, I needed another surgery to repair a hernia an[...] abdominal disfigurement. In July 2014, I had to have my gallbladder removed.

10. In September 2014, I suffered a stroke caused by stress and incredibly high blood pressure. While I was hospitalized, the doctors discovered that I have an aneurysm which may require additional surgery. I was advised by my doctor to decrease my stress, anxiety, and blood pressure. A sample of my medical records is attached as **Exhibit "C"**. I do not want to overwhelm the Court with my voluminous medical records, but I can certainly provide the Court with additional documentation of my fragile health, if necessary.

11. The Plaintiff has virtually moved into his mother's four (4) bedroom house (for which he is the trustee) located at 316 West Neck Road, Huntington, New York. The Plaintiff has only slept at the marital residence sporadically since he filed for divorce.

12. It is imperative that I continue to reside in the marital residence which is centrally located to my health care providers. It is very stressful for each time the Plaintiff returns to the marital residence. That stress and anxiety could have deadly consequences for me given the fact that I have an aneurysm.

13. Based on the fact that the Plaintiff has established an alternate

which it was based, be served upon the Plaintiff's counsel, via overnight mail, on or before the 13 day of November, 2014 be deemed good and sufficient service thereof

**GRANTED**

NOV 06 2014

JERISHA PASCALE

ENTER:

J.S.C.

**HON. DAVID T. REILLY**

Pursuant to 22 NYCRR §130-1.1-a
Respectfully Submitted,
**THE MEYERS LAW GROUP, P.C.**

By: Natasha Meyers, Esq.
Attorney for Defendant
55 Elm Street
Huntington, New York 11743
(631) 784-7722

**Affidavit**            Affirmation

**AFFIDAVIT**

-against-

BRIAN H. DENKER-YOUNGS,

**Assigned Justice:**
Hon. David T. Reilly

Defendant.

------------------------------------------------------------x

STATE OF NEW YORK)
)ss.:
COUNTY OF SUFFOLK)

BRIAN H. DENKER-YOUNGS, being duly sworn, deposes and says:

1. I am the Defendant in the above-captioned action and submit this affidavit in support of my motion for an order:

(a) Awarding the Defendant exclusive use, occupancy and possession of the marital residence, located at 33 Pennington Drive, Huntington, New York and its contents;

(b) Directing the Plaintiff to pay his pro-rata share of the mortgage, homeowner's insurance, property taxes, heating oil, electric, landscaping, and repairs on the marital residence and to immediately pay and bring current any and all arrears that may exist with respect to any of the foregoing charges and expenses, retroactive to the date of this application;

(c) Awarding the Defendant exclusive use and enjoyment of the 2014 Mercedes GLK automobile that he operates and the 2012 Volkswagen Eos automobile;

1

(d)    Directing the Plaintiff to pay the lease payments, car insurance and repairs on the Mercedes automobile, retroactive to the date of this application;

(e)    Directing the Plaintiff to immediately provide an accounting $125,000.00 used from the Home Equity Line of Credit from the date the line of credit was opened until the present time;

(f)    Directing the Plaintiff to immediately provide an accounting of what the Plaintiff did with his income from the date of marriage until the present time;

(g)    Directing the Plaintiff to immediately provide an accounting of the payments made on his Chase Sapphire Credit Card from the date of marriage until the present time;

(h)    Directing the Plaintiff to immediately provide an accounting of the medical insurance checks he received on the Defendant's behalf from the date of marriage until the present time;

(i)    Directing the Plaintiff to pay interim counsel fees on behalf of the Defendant in the sum of $10,000.00, without prejudice to future applications for additional awards, if warranted;

(j)    Awarding the Defendant such other and further relief as to this Court may seem just and proper.

## ACTION FOR DIVORCE

2.    The Plaintiff commenced this action for divorce on August 27, 2014. A copy of the Summons with Notice is annexed hereto as **Exhibit "A"**. I was served with a copy of the Summons with Notice and subsequently appeared by counsel. A copy of the Notice of Appearance is attached as **Exhibit "B"**.

2

and we were married on July 30, 2011, only a few days after New York State legalized same sex marriage in New York. We do not have any children together.

4. Our marriage has been irreparably damaged due to the Plaintiff fraudulent misrepresentation of his religious beliefs, his misuse of marital income and assets, and his lack of compassion during my recent major medical procedures amongst other things.

## EXCLUSIVE OCCUPANCY

5. It is respectfully requested that I be awarded exclusive use, occupancy and possession of the marital residence, located at 33 Pennington Drive, Huntington, New York and its contents due to the Plaintiff's voluntary relocation, the history of physical violence and the emotional distress the Plaintiff has inflictede upon me.

6. I am in poor health. I have had five (5) major operations over a period of two (2) years. In January 2013, I underwent a posterior inter-body lumbar fusion at Huntington Hospital. During my six (6) week recovery, the Plaintiff spent his time after work with his mother instead of caring for me or keeping me company during my difficult recovery. I was left alone each day from 6:45 a.m. until 9:00 p.m.

7. On or about March 2, 2013, complications from my spinal surgery left me temporarily paralyzed. While I cried in bed out of fear and pain, the Plaintiff thoughtlessly lay next to me in bed and masturbated rather than providing me emotional support. I was so hurt and enraged by the Plaintiff's grossly inappropriate behavior that

3

residence and the return to the marital residence causes me to suffer...

and anxiety which could aggravate my aneurysm, it is respectfully requested that I b...

awarded exclusive use, occupancy and possession of the marital residence, located...

33 Pennington Drive, Huntington, New York and its contents.

## PENDENTE LITE SUPPORT

14.   The Plaintiff is employed as a History teacher for the Oyster Bay

East Norwich School District. His annual gross salary is $123,641.00. A copy of his

pay stub is attached as **Exhibit "D"**.

15.   The Plaintiff also worked as a summer camp counselor for eighteen

(18) years until he suddenly decided to stop working summers beginning in the year

2011, which significantly reduced our household income and placed greater financial

stress upon me while I recovered from major surgery. In the summer of 2013, I

returned to work, with 42 staples still in my stomach so I could help provide financially

for our family. The Plaintiff refused to work that entire summer.

16.   This past summer, the Plaintiff returned to working at summer camp

but he had to do so at a reduced salary. The Plaintiff earned $3,500.00 from summer

camp this year compared to $8,000.00 in previous years. A copy of his pay stub is

attached as **Exhibit "D"**.

17.   I recently discovered that the Plaintiff is paid $13.37 per hour by New

York State for being a personal aide and assistant to his brother, Danny, who has

Down's syndrome. The Plaintiff has never disclosed to me exactly how much money he

earns from being a personal aide or that he was even being compensated as such, but I

estimate it is approximately $130.00 per week or $6,760.00 annually. A copy of one of

the Plaintiff's pay stub from Stony Shore Home Health Services is attached as Exhibit "E" and the Plaintiff's Statement of Net Worth is attached as Exhibit "P".

18.  The Plaintiff's combined annual income is $133,901.00 which include $123,641.00 from his teaching position, $3,500.00 from summer camp and $6,760.0 for being an aide to his brother.

19.  Despite my poor health, I remain employed as a marketing executive for Frost & Sullivan, Inc.  My annual income is $93,600.  Copies of my individual income tax returns for the years 2011 and 2013 are attached as Exhibit "F".

20.  I also earn a nominal income working sporadically as a Rabbi.  My annual gross income from this source was approximately $3,654.00 in 2013.  I did not file a corporate tax return.

21.  My combined annual gross income in 2013 was $97,254.  My income for the current year will be less given the fact that I have had less work as a Rabbi due to my poor health and inability to work in that capacity.

## FINANCIAL BACKGROUND

22.  The Plaintiff and I opened our first joint checking account at Bethpage Federal Credit Union on August 13, 2010 when we began living together and the Plaintiff took on the responsibility of paying our bills.  I now know that this financial arrangement was a tremendous mistake.

23.  On several occasions, our checking account was overdrawn due to the Plaintiff's poor management of our income.  When I questioned the Plaintiff as to where his income was going, he told me "to the best of my knowledge I'm paying bills".  However, that was not entirely the case.

6

stub is attached as **Exhibit "G"**. Commencing prior to our marriage and continuing up very recently, $1,000.00 from my salary was directly deposited into our joint checking account with Chase bank and the remaining $1,400.00 was deposited into my individual account with Citibank.

25.   I used my individual checking account with Citibank to pay the following bills:

| | |
|---|---|
| Cable, internet and telephone | $175 |
| Cell phone | $160 |
| Volkswagen lease | $440 |
| Alarm | $ 54 |
| Groceries | $400 |
| Citibank credit card | $250 |
| Work expenses | $250 |
| Gas | $400 |
| Dining out | $250 |
| Internet & Cable – Brooklyn | $105 |

26. If any money was left in my individual account at the end of the month I transferred it into our joint account. A copy of my Statement of Net Worth is attached as **Exhibit "H"**.

27. It appears to me that the Plaintiff had his salary deposited into a checking account at Bank of America. I do not know how much of his salary the Plaintiff deposited into our joint account, but he has certainly not been depositing all his income into our joint account or on occasion even half.

28. For the period of time we rented the cottage at the marital residence a portion of the rental income was used to pay the cleaning lady, but I do not know what the Plaintiff did with the rest of the money.

7

| Mortgage | $2,788 |
| Home Equity Line of Credit | $ 265 |
| Electric | $ 726 |
| Oil | $ 500 |
| Water | $ 175 |
| Rent for Apartment in Brooklyn | $ 817 |

30.    I recently rented out the cottage at the marital residence to a new tenant for a twelve (12) month lease after a four (4) month period of vacancy. I plan on using the rental income of $1,700.00 per month to pay down the home equity line of credit on the marital residence, which has been exhausted by the Plaintiff without my knowledge.

31.    On October 15, 2014, I closed the joint checking account.  I have since taken on the responsibility for making a payment on the Home Equity Line of Credit, paying one-half of the electric bill, and paying the rent for the apartment in Brooklyn.

32.    Now that the joint account is closed, I do not know if the Plaintiff will voluntarily contribute towards the carrying charges on the martial residence and I cannot afford to maintain the house and the apartment without a financial contribution from the Plaintiff.  He has not to date, to my knowledge.

33.    In the month of October 2014, I paid the following bills:

| Brooklyn Apartment | $ 900 |
| Tax debt installment | $ 300 |
| PSE&G | $ 363 |
| Cleaning lady | $ 90 |
| Cell phones | $ 160 |
| Volkswagen lease | $ 439 |

8

M

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF SUFFOLK  :  PART 30

3    ------------------------------------------x

4    EDWARD DENKER-YOUNGS,

5                 Plaintiff,

6                             INDEX NO.
                             16968/2014

7          -against-

8    BRIAN DENKER-YOUNGS,

9                 Defendant.

10    ------------------------------------------x

11                  December 11, 2014
                  Central Islip, New York

12    B E F O R E: Hon. David T. Reilly,
                  Supreme Court Justice

13

14    A P P E A R A N C E S:

15             SIMONETTI & ASSOCIATES
             For the Plaintiff

16             144 Woodbury Road
             Woodbury, New York  11797

17             BY:  Maria Alibertis, Esq.

18             THE MEYERS LAW GROUP, P.C.
             For the Defendant

19             55 Elm Street
             Huntington, New York  11743

20             BY:  Natasha Meyers, Esq.

21

22                  ROBIN VIOLA, RMR, CSR

23                  SENIOR COURT REPORTER

24

25

1    COURT CLERK:  Add on to the status

2  conference, Edward Denker-Youngs versus Brian

3  Denker-Youngs.

4    THE COURT:  Step up please.

5    COURT CLERK:  Appearances please.

6    MS. ALIBERTIS:  Maria Alibertis,

7  Simonetti and Associates, 144 Woodbury Road,

8  Woodbury, New York on behalf of Edward John

9  Denker-Youngs.

10    Good morning, Your Honor.

11    MS. MEYERS:  Natasha Meyers, the

12  Meyers Law Group, 55 Elm Street, Huntington,

13  New York, 11743, for Brian Denker-Youngs.

14    Good morning, Your Honor.

15    THE COURT:  Good morning.

16    Good morning, gentlemen.  I asked

17  your attorneys back and yourself back, now we

18  have competing, in a sense, competing orders to

19  show cause.  The present one before me is an

20  order to show cause by Edward John

21  Denker-Youngs requesting some similar relief

22  that was requested in the earlier order to show

23  cause.

24    When you came before me, I can't

25  quote what I said, but I asked you to try and

1    tack things down, stay calm and we will get to

2    it.  The schedules apparently didn't allow us

3    to get to it quicker than you all could figure

4    out how to get things a little murkier in the

5    interim.  Police reports, bagging of personal

6    possessions, physical injury, all allegations,

7    I candidly tell you right now is not what I

8    wanted to hear when you came back.  You have,

9    as litigants, you have failed to try and abide

10    by my encouragement to get the matter behind

11    you, work with your attorneys.  In fact I don't

12    think you're listening to your attorneys.  I

13    don't know, but I just don't think you are

14    because I have had the pleasure of seeing both

15    of these attorneys before me and normally when

16    we have a discussion and we try and move

17    forward on something, they are more than

18    capable of bringing to fruition positive

19    outcomes from their clients.  So I know the

20    inability is not from their vantage point.  And

21    I can only assume where it's coming from.

22                I have to tell you as a general

23    matter when orders to show cause come to me and

24    temporary relief is requested, I don't jump for

25    joy giving them.  Why I don't jump for joy in

1    giving them is 'cause I don't think it gives

2    either of you a sense that justice has been

3    served by me making immediate decisions about

4    who does what, when, where and how.  I would

5    think that as someone standing before me, you

6    would like more of an opportunity to be heard

7    by both papers and maybe even a hearing if

8    necessary.  However when you all take matters

9    into your own hands, you force me into making

10    temporary decisions.

11         Ms. Meyers, do you know -- I haven't

12    read real candidly the rental agreement but is

13    it a month to month or is it a year?

14         MS. MEYERS:  It is what I believe to

15    be, Judge, a year.  The term of the agreement

16    is one year.

17         THE COURT:  Okay, fair enough.  Can

18    it be broken on thirty days notice; is that

19    what I'm looking at?

20         MS. MEYERS:  Landlord agrees to give

21    tenant thirty days notice prior to termination

22    of rental.

23         THE COURT:  But it still is a year.

24    I'm not so sure one can break it.  We will

25    leave that to another day.

1           Am I correct, Ms. Meyers, help me

2  with the dates here.  The cottage is marital

3  property.  Can you give me that?

4           MS. MEYERS:  Correct.

5           THE COURT:  And on October 15, 2014

6  that property was rented; right?

7           MS. MEYERS:  Yes, Your Honor.

8           THE COURT:  Was it rented by both

9  parties in the agreement?

10          MS. MEYERS:  My client is telling me

11  that it was.  Previously, prior to the divorce

12  action, it was rented as well by both parties.

13          THE COURT:  Counsel, did your client

14  come on board with the rental?

15          MS. ALIBERTIS:  My client was made

16  aware that Mr. Denker-Youngs was going to rent

17  the property.  He did not receive consent from

18  my client nor did my client ever see this lease

19  agreement or sign it.  Apparently some kind of

20  corporation was opened with the property

21  address and we just recently became aware of

22  this, so my client did not consent to the

23  tenants.

24          THE COURT:  Another example of the

25  problems when people don't tack down these

1   issues carefully, i.e., even let's just assume

2   both people agree, why don't I have the

3   signatures of both owners of the premises on

4   this lease, and then it would be conclusive, so

5   again folks, gentlemen, please talk to your

6   attorneys so you don't get into a more

7   difficult, problematic situation.

8         Am I correct to understand that Mr.

9   Edward John Denker-Youngs is the individual who

10   provides the health insurance for all members

11   of the household?

12         MS. ALIBERTIS:  That is accurate.

13         THE COURT:  That is going to be kept

14   in place --

15         MS. ALIBERTIS:  Absolutely.

16         THE COURT:  -- during the pendency of

17   this action?

18         MS. ALIBERTIS:  Absolutely.

19         THE COURT:  Now Ms. Meyers, there's

20   two cars.  You might think this is a real

21   difficult one.  It really isn't.  Am I correct

22   there's two cars?

23         MS. MEYERS:  Yes, Judge.

24         THE COURT:  Which car does your

25   client want to use?

1    MS. MEYERS:  The Mercedes.

2    THE COURT:  All right.  Your client

3    will have exclusive use and occupancy pending

4    this litigation of the Mercedes.  He's

5    obligated to pay all lease payments and all

6    obligations under that vehicle.

7    Sir, by default you get the

8    Volkswagen.  Make the payments.

9    MR. EDWARD DENKER-YOUNGS:  I will.

10   THE COURT:  Out of curiosity, are the

11   individuals named on these payments, loans or

12   leases the same individual that now has

13   exclusive use and occupancy?

14   MS. ALIBERTIS:  I don't believe so.

15   I believe that both vehicles are leased in my

16   client's name.

17   MR. EDWARD DENKER-YOUNGS:  Both

18   names.

19   MS. ALIBERTIS:  I'm sorry, both

20   names.

21   THE COURT:  So if they're both under

22   each other's names, I would guess that you have

23   the opportunity to have duplicate statements

24   sent to each other and I would take advantage

25   of that right that I think you have, so that

1   you all can be sure that each is paying the

2   other vehicle.  So that you each don't

3   inadvertently damage each other's credit rating

4   'cause there is no reason for that to happen.

5         Now based on the discord and

6   inability --

7         MS. ALIBERTIS:  One correction, Your

8   Honor.  The Mercedes payment is being taken out

9   of my client's bank account so I'll have him

10   put a stop on that so that Mr. Brian

11   Denker-Youngs can make those payments.

12         THE COURT:  When was the last payment

13   made, sir, if you know?

14         MR. EDWARD DENKER-YOUNGS:  I believe

15   the 7th of December.

16         THE COURT:  Ms. Meyers, you're on

17   notice now there is going to be a

18   discontinuation of your automatic withdrawal.

19         Before you discontinue, sir, if there

20   was an extra percentage point taken off the

21   lease because it was automatic withdrawal, then

22   call them up and figure out how this gentleman

23   can continue to have -- I have no idea and I

24   don't want to know by the way.

25         MS. ALIBERTIS:  I don't think it

1   would be an issue.

2          MR. EDWARD DENKER-YOUNGS:  Fine.

3          THE COURT:  You all can't cohabitate

4   together any more, that is self evident, it

5   will only get worse unless Counsel, do you

6   disagree with me?

7          MS. MEYERS:  No, no.  My client would

8   just like me to make a statement as to the

9   issue of exclusive use and occupancy, Judge.

10  This morning my client went through a list with

11  me when he got here as to reasons why he needs

12  to stay in the Huntington area and I would just

13  like to place that on the record.

14         THE COURT:  Absolutely.

15         MS. MEYERS:  His therapist that he

16  sees twice a week is located in Huntington.  He

17  goes to a hypnotherapist once a week in

18  Huntington.  His psychiatrist is in Hauppauge.

19  His primary care doctor is on East Main Street

20  in Huntington.  His pain management doctor is

21  in Syosset.  His physical therapist is in

22  Huntington.  And due to the stroke that he

23  suffered on September 26, 2014, he can't lift

24  his leg and get into a tub, so the house in

25  Huntington has been made handicapped, he's

1    telling me, accessible so that he can get into
2    the tub by not having to lift his leg.  He
3    cannot get into his apartment in Brooklyn
4    because the tub -- due to these injuries that
5    he sustained as a result of his stroke.
6           The banking that he does for his
7    companies 'cause he works from home, Judge, is
8    in -- he works with Frost and Sullivan, the
9    Long Island Chuppah and Modern Divinities, he's
10   a rabbi, these are employments that he works
11   from the house.
12          THE COURT:  How long have those
13   businesses been in operation, Counsel?
14          MS. MEYERS:  More than two years.
15          THE COURT:  How long?  Would you ask
16   your client?
17          MS. MEYERS:  Frost and Sullivan he's
18   been employed with them for over 10 years.  And
19   he's been working from home there -- I have a
20   letter from his employer that it's home based
21   as well and the work with Long Island Chuppah
22   and Modern Divinity as a rabbi, he's been
23   employed for two years.  He sees clients in
24   Huntington.  He has accounts with the Thatched
25   Cottage, which he's telling me is going to

honor his contract when they reopen shortly, as well as the Harbor Club.

The banking that he does with Bethpage bank, the bank is only located in -- I shouldn't say only located. He's telling me it's not located in Brooklyn and it's located here.

As a result of his inability really at this point due to his health to move himself to Brooklyn where he's established himself here in Huntington, he's also being treated by the Coalition for Domestic Violence, he has sessions with them, and my client is telling me that -- he's telling me that Mr. Edward Denker-Youngs has other residences -- another residence where he can reside. He's received mail at 316 West Neck Road. That is the address where I believe his mother lives, in the house that his mother is living in.

THE COURT: Is that the house that his brother, if I'm correct, he cares and treats but if he resides there, he is unable to collect that additional income?

MS. ALIBERTIS: That is ███████

MS. MEYERS: I don't know if that

1    part is accurate, whether he cannot get the

2    income or not but it's the house.

3              THE COURT:  That's the allegation

4    made by Edward John Denker-Youngs.

5              MS. ALIBERTIS:  That's correct.

6              MS. MEYERS:  Correct.  So my client

7    also told me due to financial reasons back in

8    October, he notified the co-op board in

9    Brooklyn that he cannot afford to maintain the

10   maintenance payments on the Mitchell-Lama and

11   that was a letter that was by the manager on --

12   I'm looking at it for the first time, Judge,

13   that on November 24th he contacted the

14   management company about releasing the

15   Mitchell-Lama.

16             THE COURT:  November 24th of this

17   year?

18             MS. MEYERS:  Yes, November 24th of

19   this year.

20             THE COURT:  When there had been no

21   decision on the exclusive use and occupancy?

22             MS. MEYERS:  No, there is no decision

23   on the exclusive use and occupancy.

24             THE COURT:  Correct.  Your client

25   went ahead and started to make --

1            MS. MEYERS:  Inquiry as to how he can

2     release the -- what the process would be to

3     release the Mitchell-Lama.  He inherited --

4            THE COURT:  I know it's inherited.

5            MS. MEYERS:  So he went and took

6     steps to see what would be required of him

7     because of financial --

8            THE COURT:  Counsel, is that

9     apartment vacant now or is it occupied?

10            MS. MEYERS:  There is someone who is

11     staying in the apartment, I'm told, because he

12     had financial issues so he has a friend who is

13     staying there a few days a week.

14            THE COURT:  Okay.  Ms. Meyers,

15     anything more?  'Cause I'm going to be -- I

16     don't mind you putting it on the record, I just

17     ask a little speed.  I don't want to cut you

18     off but a little speed 'cause we do have a

19     trial going on.

20            MS. MEYERS:  I understand.  Last with

21     the issue of the cottage, my client did tell me

22     during the marriage they have rented out this

23     cottage.  That it's their common practice to

24     have rented out the cottage and that's why we

25     were asking for exclusive use and occupancy for

1    the reasons set forth in the motion and the

2    statements I made on the record on behalf of my

3    client this morning.

4           THE COURT:  What were the revenues

5    from the cottage to be used for?

6           MS. MEYERS:  Pay down the home equity

7    line of credit.

8           MS. ALIBERTIS:  May it please the

9    Court.

10          I'm going to go backwards a little

11   bit with regard to --

12          THE COURT:  Not too far back.

13          MS. ALIBERTIS:  Not too far backward.

14          With regard to Mr. Denker-Youngs'

15   physicians and all of that.  My client does

16   advise his main --

17          THE COURT:  That would be the

18   defendant?

19          MS. ALIBERTIS:  Yes, the defendant.

20   His main physicians are at North Shore LIJ.

21   His apartment in Williamsburg to North Shore

22   LIJ is 15.7 miles.  The Huntington home to

23   North Shore LIJ is 18.8 miles.  There was an

24   argument previously made that all his

25   physicians were located closer to home.  That's

1    not accurate.

2         My client was notified recently that

3    Mr. Denker-Youngs has not paid the home equity

4    line of credit for the month of November.  My

5    client actually did.  He has not paid the

6    mortgage since my client left in October or

7    September, one of those dates.

8         He prepaid the Optimum account on my

9    client's credit card for six months and then

10   unilaterally changed the Optimum account to

11   FIOS without advising my client, without

12   telling him anything.

13        THE COURT:  Just so you know Counsel,

14   so you can narrow whatever you want to tell me,

15   my focus is to get some temporary relief and if

16   you didn't catch it already, one person's going

17   and one person's staying.

18        MS. ALIBERTIS:  I understand, Your

19   Honor.  This is the first we are notified that

20   someone is residing in the home in Brooklyn.

21        THE COURT:  I didn't hear that strong

22   a statement.

23        MS. ALIBERTIS:  A friend is staying

24   there apparently.

25        THE COURT:  Every now and then.  A

1    rriend that could help someone.

2              Continue.

3              MS. ALIBERTIS:  Correct.  The

4    defendant has actually resided in this Brooklyn

5    apartment during the pendency of the marriage

6    three to four days a week because it was closer

7    to his prime location for his employment, which

8    is in New York City and Rockville Centre.

9              THE COURT:  Is that after he had the

10   stroke or before he had the stroke?

11             MS. ALIBERTIS:  I believe it's before

12   he had the stroke.  The stroke was last month

13   and his health ailments actually predate the

14   marriage and after the marriage.  They have

15   been on going.

16             With regard to the tub, my client

17   advises there is a shower in the house.  It's

18   not handicapped accessible, it's nothing for

19   that, it's just a plain shower and yes, it is

20   my client's position that yes, he does help aid

21   his brother who has Down Syndrome.  He does get

22   compensation from the State with regard to

23   that.

24             THE COURT:  As long as he doesn't

25   reside there?

MS. ALIBERTIS:  Correct.  In addition, his brother who has Down Syndrome doesn't deal with change very well and having an additional person residing in the house is not the ideal situation or is not something that he can handle.

Bethpage bank, I don't even have to address that, there is many, many branches where Mr. Denker-Youngs can go ahead and do his banking information.

And my client just simply doesn't have another alternate residence.  It's just basically what it comes down to.

THE COURT:  Am I correct also based upon the allegations that are before me that there is a claim of a substantial separate property interest by your client in the marital residence?  Is that correct?

MS. ALIBERTIS:  That's correct.  My client owned a home prior to the marriage.  He sold the home.  $191,000 went from his prior home into the current home.  So my client's separate property claim is --

THE COURT:  There is presently maybe $100,000 worth of equity in the house?

MS. ALIBERTIS:  I believe there is more.  I would think there is more.  We don't know.  The house was just recently fully renovated.

THE COURT:  You agree with me, Counsel, if your separate property claim was a valid claim and we haven't ruled on it yet, that the person most apt to be able to buy out the other side would be your client, should they wish to have the marital residence?

MS. ALIBERTIS:  Absolutely.

THE COURT:  Counsel, does your client have any claim on the Mitchell-Lama co-op apartment?

MS. ALIBERTIS:  To our understanding, he doesn't.  It's prior to the marriage, it's separate property, correct.

THE COURT:  All right.

Ms. Meyers, anything quickly?

MS. MEYERS:  I can't comment as to the separate property at this point.

THE COURT:  Let the record reflect that the Court observed that the defendant, Brian Denker-Youngs, seemed to not, by facial expression and concern, does not seem to

believe that certainly that it's a full
separate property claim of $191,000.  We can
let history decide that one down the road.

      MS. ALIBERTIS:  I do have a HUD
statement attached to my motion papers and I
have --

      THE COURT:  I read it.

      MS. ALIBERTIS:  Thank you.

      MS. MEYERS:  And last, Judge, since
we were here first when I filed that order to
show cause, you did issue a directive from the
bench basically that said let's maintain the
status quo until we can come back to you.  And
my client has notified me that on the day that
he was traveling to Florida, his husband came
to the home and the allegations are that wires
were cut so the cable was disconnected.  The
alarm system was shut off and there were issues
in the house, items were removed from the
residence.

      THE COURT:  How do you respond to the
allegation that the tenants in the cottage were
told if Mr. Edward John Denker-Youngs
approached the house to call the police?

      MS. MEYERS:  I'm unaware of those

1    else that you feel would be appropriate, has 24

2    hours to remove such personal belongings as he

3    may deem he needs.  And then if there is any

4    disputed property, it is to be left but

5    inventoried so that we can be sure that it's

6    preserved.

7              Now sir, I don't expect that the

8    defendant is going to be able to pull each and

9    every personal item in 24 hours.

10              MR. EDWARD DENKER-YOUNGS:  I

11   understand.

12              THE COURT:  You are a guardian and a

13   custodian for any of his other personal

14   property and for any of the marital property.

15   And I expect you to preserve it and protect it.

16              I also order and direct that all the

17   rental income from the cottage be paid to the

18   plaintiff Edward John Denker-Youngs.  And I

19   direct Brian Denker-Youngs to issue a letter to

20   the tenants advising of that and that letter --

21   in fact, let me change that.  I direct Ms.

22   Meyers' firm on behalf of her client to issue a

23   letter to the tenants directing that.

24              When is the next rent payment, Ms.

25   Meyers, coming?  Is it January or December?

1      MS. ALIBERTIS:  December 15th.

2      MS. MEYERS:  December 15th, Judge.

3      THE COURT:  All right.  So you only

4   have a couple days to get that accomplished.

5   If for some reason your client receives that

6   rent from December 15th, he is to give it to

7   you.  Then you are to get it to the plaintiff's

8   attorney and we can all go forward.

9      MS. MEYERS:  Are we holding that in

10   escrow, the rental check, or using that to pay

11   the mortgage or the home equity?

12      THE COURT:  We will get there.

13      MS. MEYERS:  Okay.

14      THE COURT:  All right.

15      Sir, in giving you exclusive use and

16   occupancy of 33 Pennington Drive, you are also

17   responsible to pay the mortgage, home equity

18   and all costs and expenses associated with

19   that.

20      Mr. Brian Denker-Youngs, I would

21   issue, so we all understand the ground rules,

22   even though it seem to be his separate

23   property, he has exclusive use and occupancy of

24   the Brooklyn apartment.  And his occupancy

25   should be respected by all parties concerned.

1    And he's responsible for the payment of any

2    costs and expenses relating to that Brooklyn

3    apartment.

4              I further direct and order that the

5    plaintiff is to maintain the health insurance,

6    I understand that health insurance is for both

7    parties, until further order of this Court.

8    And I also issue an order restraining both

9    parties from publishing to the public any

10   personal information or financial information

11   of the other party.

12             Folks, if you want to publicize this

13   matter, you will know every court date.  You

14   can tell all your friends when you're going to

15   be in court.  They're welcome to sit in the

16   gallery and watch.  But we are not going to be

17   putting this out so that someone's personal

18   information is going to be shared with the rest

19   of the world.  It doesn't suit anyone's

20   well-being to do that.

21             Any other questions?  Anything else

22   that someone wants --

23             MS. MEYERS:  If I may, you have my

24   order to show cause.  If I can just look at it

25   so I can answer that question correctly.

1     THE COURT:  You may take it back.

2     MS. ALIBERTIS:  We have one more

3  question.  Because recently FIOS was installed

4  in the house, my client's telephone number

5  which was available to the house and he had for

6  20 years was disconnected.  We are asking that

7  we are able to reinstate the Optimum account

8  somehow some way.

9     THE COURT:  My view is that, sir, so

10  you get the drift, if you haven't gotten the

11  drift already, get it.  You're going to be

12  responsible for whatever is in that house.  So

13  if you want to keep FIOS and try and move a

14  number there, great.  If you want to go back to

15  Optimum, fine, but if the FIOS account is with

16  your spouse's name, you're to call FIOS and say

17  you want it discontinued and you're going to

18  advise, through your attorney, your spouse so

19  he can give the authorization so he's no longer

20  continually billed for it.  It's not rocket

21  science.

22     MS. MEYERS:  Just Your Honor, if we

23  can, medical insurance reimbursement checks I'm

24  told are given to the plaintiff.  If we can

25  just have an order, as part of this temporary

1    order, directing that as he gets -- as

2    plaintiff gets the reimbursement checks, he

3    will immediately forward them to my office or

4    directly to my client.  They're in the tune of

5    I'm told over --

6              MS. ALIBERTIS:  That has already been

7    happening.

8              THE COURT:  Okay.  I order and direct

9    that any insurance checks that are due to

10   either party be sent and if it comes to the

11   other party, they send it to their attorney and

12   it's to be sent over to the rightful person.  I

13   don't think that is the most articulate way of

14   saying it, but you know what I want.

15             MS. ALIBERTIS:  That's what is

16   happening, Your Honor, so that's fine.

17             MS. MEYERS:  Yes, Your Honor.

18             MS. ALIBERTIS:  Just for the Court's

19   knowledge, there are security cameras that Mr.

20   Denker-Youngs recently put up.

21             THE COURT:  24 hours to remove any

22   personal property.

23             MS. ALIBERTIS:  Thank you.

24             THE COURT:  Sir, I will tell you

25   this, just so it's clear, if the security

1   cameras are left up in the house and you don't

2   find that that is a suitable way to live, you

3   have my permission to remove them and to box

4   them carefully for whatever someone might have

5   in the future.

6          MR. EDWARD DENKER-YOUNGS:  Thank you.

7          THE COURT:  Folks, we will see you

8   here on January 7th.  You're welcome to include

9   in any response to your papers how my temporary

10  order may adversely affect you financially.  I

11  tried to go through it to make sure that there

12  was nothing of a particularly onerous burden.

13         I also strongly urge that, sir, that

14  both parties reflect on what your true separate

15  property claim may or may not be.  And if it is

16  substantial, you all might want to agree to

17  sell the house right away or, sir, you might

18  want to buy him out.  Maybe you can't solve

19  everything today.  Why don't you start working

20  at one thing at a time and get it done.

21         MS. MEYERS:  Last question.  This

22  order is in effect until -- you said it was a

23  temporary order.

24         THE COURT:  It's temporary relief.

25  You both have pendente lite orders in place.

1    And it will stay in place throughout -- to the

2    determination of your order to show cause and

3    cross order to show cause.

4                    MS. ALIBERTIS:  Any other day other

5    than January 7th.  That is my Christmas.  Greek

6    Orthodox.

7                    THE COURT:  Okay.

8                    How about the 12th?

9                    MS. ALIBERTIS:  Fine.

10                    MS. MEYERS:  I'm on trial on the

11    12th.

12                    THE COURT:  Ms. Meyers, I got to get

13    you to Justice Leo's chambers otherwise I'm

14    going to be in trouble.

15                    MS. MEYERS:  January 15th?

16                    THE COURT:  Does anyone like the

17    15th?

18                    MS. ALIBERTIS:  That's fine.

19                    MS. MEYERS:  One last thing.  My

20    client is telling me he doesn't have any money.

21    He has no access to credit cards.  They're all

22    maxed out.  The savings, he has no access to

23    the joint savings, so financially the onus now

24    to remove --

25                    THE COURT:  Does he get a salary?

1           It's your call, Counsel.

2           MR. BRIAN DENKER-YOUNGS:    Your Honor

3    --

4           MS. MEYERS:    I'm being told he has no

5    access to monies right now.    He's asking --

6           THE COURT:    Counsel, you have to

7    respond to my question.    Is he getting paid?

8           MS. MEYERS:    He is getting paid.

9           THE COURT:    What does he earn a week

10   or a month?

11          MS. MEYERS:    I will speak to him,

12   Judge.

13          MS. ALIBERTIS:    Your Honor, his

14   salary for 2013 was $95,000.    He was also

15   collecting the rental income for the past

16   couple of months in the amount of $1,700 a

17   month and was not paying the mortgage nor the

18   home equity line of credit nor the majority of

19   the expenses so --

20          MS. MEYERS:    That is not what we're

21   being told.

22          THE COURT:    You got to get everyone

23   ready.

24          MS. MEYERS:    Thank you, Judge.

25          MS. ALIBERTIS:    Thank you, Your

1    Honor.

2         MS. MEYERS:  Your Honor, my client --

3         THE COURT:  Sir, do you need to sit

4    down, first of all?

5         Sir, do you need to sit down?

6         MR. BRIAN DENKER-YOUNGS:  No.

7         THE COURT:  'Cause I would extend you

8    the courtesy of that.  All right.

9         Sir, look at me please.  I know that

10   what you're receiving today in your mind and

11   consideration is a tough determination.  I also

12   know and want to remind you, I realize in your

13   attorney's papers there are significant

14   allegations against your spouse with regard to

15   his financial conduct.  The issue today is

16   because, sir, is because I'm not seeing two

17   individuals being able to stay in the present.

18   I have to make a decision.  As I tell you, you

19   both have forced me to make a temporary

20   decision.  And as I told you, sir, I don't like

21   doing that.  Briefly, sir.

22        MR. BRIAN DENKER-YOUNGS:  I have

23   tried and I heard what you said when we were

24   here and I agree with you.  This is a person

25   who I did have a commitment with for six years